Brett R. Nolan (*pro hac vice*)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Suite 801
Washington, DC 20036
(202) 301-3300 | bnolan@ifs.org
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| HARRY POLLAK, | |
|     Plaintiff, | |
| vs. | Case No. 2:22-CV-49-ABJ |
| SUSAN WILSON, in her individual capacity, *et al.*, | |
|     Defendants. | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Table of Contents ............................................................................................... i

Table of Authorities ........................................................................................... ii

Introduction ....................................................................................................... 1

Nature of the Case ............................................................................................. 1

Statement of Undisputed Material Facts ......................................................... 2

Legal Standard ................................................................................................... 8

Argument ............................................................................................................ 8

    I.   The Personnel Rule violates the First Amendment as applied to speakers mentioning staff while discussing school policy (Count I). ............................... 9

        A.   The Personnel Rule is unreasonable because it bans speakers from commenting on matters discussed at SCSD2's public meetings. .............. 10

        B.   The Personnel Rule unreasonably invites arbitrary enforcement. .......... 14

        C.   The Personnel Rule discriminates based on viewpoint. ........................... 16

        D.   The Board unconstitutionally applied the Personnel Rule against Pollak. ...................................................................................................... 18

    II.  The Offensive Speech Rule violates the First Amendment (Count Three). .... 20

    III. The Offensive Speech Rule is Vague and Overbroad (Counts Five & Six)...... 21

    IV. Both Rules violate the Petition Clause (Counts Two and Four). .................... 23

    V.  Pollak is entitled to nominal damages and a permanent injunction. .............. 24

Conclusion ........................................................................................................ 25

TABLE OF AUTHORITIES

## Cases

*Bd. of Airport Comm'rs v. Jews for Jesus,*
   482 U.S. 569 (1987) .................................................................................... 10

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972) .................................................................................... 23

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
   473 U.S. 788 (1985) ...................................................................................... 9

*Culver v. Armstrong,*
   Case No. 14-CV-012, 2015 U.S. Dist. LEXIS 180491 (D. Wyo. Apr. 30, 2015) ........ 7

*Denver Homeless out Loud v. Denver,*
   32 F.4th 1259 (10th Cir. 2022) ................................................................... 25

*Faustin v. City & Cnty. of Denver,*
   423 F.3d 1192 (10th Cir. 2005) ............................................................ 21, 23

*Glover v. Mabrey,*
   384 F. App'x 763 (10th Cir. 2010) ............................................................... 23

*Gooding v. Wilson,*
   405 U.S. 518 (1972) .......................................................................... 21, 23

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) .................................................................................... 22

*Harmon v. City of Norman,*
   61 F.4th 779 (10th Cir. 2023) ............................................................... 18, 20

*Homans v. City of Albuquerque,*
   264 F.3d 1240 (10th Cir. 2001) ................................................................. 25

*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) ............................................................................... 21

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.,*
   3 F.4th 887 (6th Cir. 2021) ........................................................................ 21

*Kolender v. Lawson,*
   461 U.S. 352 (1983) .................................................................................... 23

*Lamb's Chapel v. Center Moriches Union Free School District,*
   508 U.S. 384 (1993) .................................................................................... 17

*Marshall v. Amuso,*
   571 F. Supp. 3d 412 (E.D. Pa. 2021) ................................................... 11, 22

*Matal v. Tam,*
   582 U.S. 218 (2017) (op. of Kennedy, J.) ....................................... 16, 18, 20

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ........................................................................ 18

*McElhaney v. Williams*,
   --- F.4th ---, 2023 U.S. App. LEXIS 22466 (6th Cir. Aug. 25, 2023) ...................... 12

*Minn. Voters All. v. Mansky*,
   138 S. Ct. 1876 (2018) .................................................... 9, 10, 11, 13, 14, 15, 16, 22

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................ 12

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
   460 U.S. 37 (1983) ........................................................................... 9

*Roman Cath. Diocese v. Cuomo*,
   141 S. Ct. 63 (2020) ........................................................................ 24

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ................................................................... 9, 16, 18

*Schalk v. Gallemore*,
   906 F.2d 491 (10th Cir. 1990) ............................................................... 23

*Searles v. Van Bebber*,
   251 F.3d 869 (10th Cir. 2001) ............................................................... 24

*Stoedter v. Gates*,
   704 F. App'x 748 (10th Cir. 2017) ........................................................... 24

*Summum v. Callaghan*,
   130 F.3d 906 (10th Cir. 1997) ........................................................ 8, 9, 10, 18

*United States v. Supreme Court of N.M.*,
   839 F.3d 888 (10th Cir. 2016) ............................................................... 10

*United States v. Uintah Valley Shoshone Tribe*,
   946 F.3d 1216 (10th Cir. 2020) .............................................................. 24

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021) ....................................................................... 24

*Victory Processing, LLC v. Michael*,
   333 F. Supp. 3d 1263 (D. Wyo. 2018) .......................................................... 8

*Wilbur v. Mahan*,
   3 F.3d 214 (7th Cir. 1993) ................................................................... 12

## Other Authorities

*Abusive,* Merriam-Webster,
   available at https://perma.cc/R7DYC9SR ...................................................... 21

U.S. Const. amend. I.......................................................................... 24

*Vulgar*, Merriam-Webster,
    available at https://perma.cc/Y5YP-FJZU .................................................................. 21

Webster's Third New International Dictionary (1961) ............................................. 21

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 8

INTRODUCTION

The Board of Trustees for Sheridan County School District No. 2 ordered Harry Pollak to stop speaking during its public-comment period because he mentioned the superintendent while discussing school policy. Despite allowing speakers to give complimentary remarks about SCSD2 staff both before and after Pollak spoke, the Board chair claimed that mentioning an employee for any reason violates its rule against discussing "personnel matters." This rule—which the board selectively enforced against Pollak—is unreasonable and discriminates based on viewpoint. The Board thus violated Pollak's First Amendment rights when it enforced the "personnel matters" rule against him.

The "personnel matters" prohibition is not the Board's only unconstitutional rule. Its prohibitions against "gossip," "defamatory remarks," and "abusive or vulgar language" encompass a significant amount of core First Amendment political speech. These vague and overbroad rules chill protected speech and prevent speakers like Pollak—who worry about censorship, arrest, and humiliation—from expressing themselves.

The Court should end the Board's unconstitutional policies and practices by granting summary judgment for Pollak, declaring the Board's policies unconstitutional, permanently enjoining further enforcement, and awarding Pollak nominal damages for his past harm.

NATURE OF THE CASE

This is a First Amendment case brought under 42 U.S.C. § 1983. The plaintiff, Harry Pollak, sued the trustees of SCSD2's Board of Trustees (collectively, the

"Board" or "SCSD2") after the Board prevented him from speaking during the public-comment period of its February 7, 2022 meeting. Pollak challenges the constitutionality of the rules governing public comment at SCSD2 board meetings, and he contends that the Board discriminatorily enforced those policies against him to prevent him from criticizing the superintendent's public statements.

Pollak filed suit on March 9, 2022, (ECF No. 1), and he moved for a preliminary injunction, (ECF No. 8). The Court denied that motion, (ECF No. 17), and Pollak appealed to the Tenth Circuit, (ECF No. 18). During the appeal, the Court stayed this case. (ECF No. 29). The Tenth Circuit affirmed. (ECF No. 30-1). The Court then lifted the stay, (ECF No. 31), Pollak amended his complaint (ECF No. 43), and the parties proceeded with discovery, (ECF No. 42). Discovery closed on October 2, 2023. (ECF No. 60). The defendants moved for summary judgment just before the close of discovery, (ECF Nos. 63 & 64), and Pollak now cross-moves for summary judgment on all his claims.

STATEMENT OF UNDISPUTED MATERIAL FACTS

*The Board's Public Comment Policy*

1.      SCSD2 is governed by a 9-member Board of Trustees that conducts its meetings open to the public. (ECF No. 64-1 at 1 ¶3); Ex. 1, BEDH Policy at 1.

2.      During its regular meetings, the Board receives reports and other information from SCSD2 employees, including the superintendent. Ex. 2, SCSD2 Depo. at 28:16–29:10.[1]

3.      School administrators regularly recognize employees by name during public portions of the Board's meetings. *See, e.g.*, Ex. 3 at 11 (Aug. 2021 Board Minutes); Ex. 4 at 6 (Oct. 2021 Board Minutes) ("Mr. Mayhue has had a steep learning curve and has done an incredible job . . . ."); Ex. 5 at 2–3 (Jan. 2022 Board Minutes) ("Superintendent Stults thanked Mr. Julian for all that he does and wanted to publicly recognize him for this award of merit he received."); Ex. 6 at 10 (Feb. 2022 Board Minutes); Ex. 8 at 2, 3 (Mar. 2022 Board Minutes); Ex. 9 at 8 (Oct. 2022 Board Minutes) (discussing the District Math Coordinator by name); Ex. 10 at 4 (Jan. 2023 Board Minutes)[2] (expressing "appreciation for everything [an employee] has done"); Ex. 11 a 4 (March 2023 Board Minutes) (celebrating high school theater director for putting on "amazing" performances). During this time, school administrators sometimes discuss the employee's job performance. *Id.*

4.      The Board provides time for public comments at its regular meetings. BEDH Policy at 1; SCSD2 Depo. at 19:21–23.

---

[1] Superintendent Scott Stults testified on behalf of SCSD2 under Fed. R. Civ. P. 30(b)(6). *See id.* at 15:5–16:1, 37:11–13, 38:1–8, 55:24–56:1, 86:19–21; Ex. 21 (Attachment A).

[2] The minutes from January 2023 do not have page numbers. Page 4 is also marked as SCSD#2 Doc. 00382.

5.      The Board has adopted a policy that restricts what citizens can talk about during the public-comment period, which it calls the BEDH Policy (the "Policy"). *See* Ex. 1.

6.      The purpose of the public-comment period is "to hear the viewpoints of citizens throughout the district." *Id.* at 1. Under the Policy, "Speakers will be recognized by the chairperson of the board and may make objective comments on school operations and programs." *Id.* The Policy further provides that "[s]peakers will be advised that their comments must be limited to items which relate directly to the school district." *Id.* at 2.

7.      The Policy includes a rule (the "Personnel Rule") prohibiting speakers from discussing personnel matters "at regular board meetings," which states: "Personnel matters are not appropriate topics to be discussed at regular board meetings. Decorum requires that such matters be entertained in executive session as arranged by the Board." *Id.*; SCSD2 Depo. at 30:7–15. The Policy does not define "personnel matters." *See generally* BEDH Policy; SCSD2 Depo. at 35:4–7.

8.      The Board gives the presiding chair discretion "to decide whether or not comments violate the policy." SCSD2 Depo. at 55:4–10; *see also id.* at 58:23–24.

9.      Defendant Susan Wilson, who served as chair during the events of this suit, understands the Personnel Rule to prohibit mentioning the name of any SCSD2 employee for any reason, Ex. 14, Wilson Depo. at 11:3–17, 34:8–20, 35:8–11. Defendant Shane Rader, the current chair, disagrees that mentioning a staff member, without more, violates the policy. *See* Ex. 15, Rader Depo. at 45:11–47:21;

49:1–50:18. Rader has allowed at least two individuals to speak positively about the superintendent, and he testified that such comments did not violate the rule. *Id.* at 46:7–9, 49:12–50:7; *see* Ex. 17 (Jan. 2023 Board Meeting Excerpt); Ex. 19 (Mar. 2023 Board Meeting Excerpt).[3]

10.    When serving as chair, Wilson "often" told speakers that "[c]ompliments and congratulations to employees are always welcome," even though she believed that such positive feedback would violate the Personnel Rule. Wilson Depo. at 36:25–37:20. She said this to make people "feel welcome." *Id.* at 37:8–9, 37:16–20.

11.    Wilson never stopped a speaker for making positive comments about SCSD2 staff, *id.* at 76:16–19, even though multiple speakers did so when she was chair, *see* Ex. 3 (August 2021 Board Minutes); Wilson Depo. at 38:18–39:15; Ex. 9 (Oct. 2022 Board Minutes); Wilson Depo. at 62:9–18, 64:7–11.

12.    The BEDH Policy also includes a rule (the "Offensive Speech Rule") prohibiting speakers from using certain kinds of language: "Speakers will not be permitted to participate in gossip, make defamatory remarks, use abusive or vulgar language." BEDH Policy at 2. Like the Personnel Rule, the terms "gossip," "defamatory remarks," "abusive," and "vulgar" are not defined. *See generally id.*

*The Board censors Pollak on February 7, 2022*

13.    The Board held a regular, public meeting on January 10, 2022. *See* Ex. 5 (Jan. 2022 Board Minutes).

---

[3] The full videos of the January and March 2023 meetings are attached as Exhibits 18 and 20. The excerpted portions include 1:39:44 through 1:43:11 from Exhibit 18 (Ex. 17) and 26:11 through 28:38 from Exhibit 20 (Ex. 19).

14.     During this meeting, Superintendent Stults reported on the district's COVID-19 Plan Update. *Id.* at 5. As part of that report, Stults commented about the school district's legal authority to enact restrictions related to protecting the health and welfare of the people. *Id.*

15.     Stults delivered these comments during the public portion of the Board's regular meeting, *id.*, but after the meeting's public-comment period, *compare id.* at 4, *with id.* at 5; *see also* Ex. 12, Pollak Depo. at 89:14–22. Individuals at the meeting had no chance to speak about the issues that Stults publicly addressed during the public-comment period. Pollak Depo. at 89:18–22.

16.     Pollak signed up to speak at the meeting on February 7, 2022. *See* Ex. 13.

17.     When it was his turn, Pollak stated that he intended to respond to the comments Stults publicly made at the meeting one month earlier. He stated:

> Hello my name is Harry Pollak. Madam Chair, Board of Trustees, and Superintendent Stults, we aim to set the record straight from the board meeting on January 10 of this year regarding Superintendent Stults rebutting parents' declaration that the board and superintendent have violated our rights under Article I, Section 38A of the Wyoming Constitution, and that Article I, Section 38C gave them the authority to do so.

Ex. 16, Feb. 7, 2022 Video at 0:00–25; *see also* Pollak Depo. at 88:12–22.

18.     Defendant Wilson, the then-chair, interrupted Pollak and asked whether this was a personnel matter. Ex. 16 at 0:25–28. Pollak stated that "Mr. Stults addressed these items last month" and so he was "addressing them this month." *Id.* at 0:42–48. Wilson told him he had to "leave because we do not discuss personnel during a board meeting in open session." *Id.* at 0:47–53. Pollak denied that he was discussing personnel matters. *Id.* 0:52–54.

19.     Wilson and Pollak then engaged in a back and forth about whether he had a right to speak and whether the Board's policies prohibited him from doing so. During that discussion, Wilson stated that Pollak was not permitted to talk about Superintendent Stults for any reason. *Id.* at 1:39–44 ("You are speaking about Mr. Stults. That's all that's to be said."). Wilson eventually asked for a recess, and the Board recessed.[4]

20.     During the recess, Superintendent Stults called the police. SCSD2 Depo. at 83:18–19. The officers responding to the call informed Pollak that he would be committing criminal trespass if he did not leave. Pollak Depo. at 106:2–13. Pollak complied with the officers' orders and left the building. *Id.*

21.     Wilson testified that one reason she enforced the Personnel Rule against Pollak was because "he was very critical in his speech." *Id.* at 43:25–44:12. Wilson "never allowed anyone to speak critical about" an employee. *Id.* at 76:16–19.

*Pollak's Ongoing Harm*

22.     Pollak still wants to speak at a school board meeting. Pollak Depo. at 124:5–11. He has chosen not to speak because he worries about the Board calling the police, having him removed, having him arrested, or telling him to leave,

---

[4] Exhibit 16 is a video of the full interaction between Pollak and Wilson up until the point at which the Board votes to recess. *See* SCSD Depo. at 77:25–78:8, 80:10–13; Wilson Depo. at 43:4–12. The defendants likewise submitted two videos which capture discrete parts of the same interaction. Pollak submits that "[t]he video recordings speak for themselves." *Culver v. Armstrong*, Case No. 14-CV-012, 2015 U.S. Dist. LEXIS 180491, at *12 (D. Wyo. Apr. 30, 2015).

making him "embarrassed and humiliated in front of the media and [his] peers." *Id.* at 124:5–21.

23.    Pollak does not believe that his comments on February 7 discussed personnel matters. *Id.* at 95:22–24; Ex. 22, Pollak Decl. at 3 (¶14 ("I was told I was not allowed to talk about personnel matters . . . even though nothing I had said had anything to do with personnel."); Pollak Depo. at 98:17–18. He does not understand how the Board interprets the Personnel Rule. *Id.* at 134:15–18. Pollak also does not know what the Policy means by gossip, defamatory remarks, abusive language, or vulgar language. *Id.* at 133:9–134:10.

## LEGAL STANDARD

Courts should grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of fact is genuine if a reasonable juror could resolve the disputed fact in favor of either side." *Victory Processing, LLC v. Michael*, 333 F. Supp. 3d 1263, 1266 (D. Wyo. 2018). "A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Id.*

## ARGUMENT

The First Amendment limits the government's authority to regulate private speech on public property. *Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997). The Supreme Court has adopted "a three-step framework for analyzing the constitutional protects" for such speech. *Id.* The Court must first determine whether the case involves "protected speech." *Id.* If so, the Court must decide what kind of forum is at issue, and then apply the scrutiny appropriate for that kind of forum. *Id.*

Here, no one disputes that speaking about government operations at a school board meeting is protected speech under the First Amendment. And the parties agree that the public-comment period of a school board meeting is a limited public forum. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983). Thus, the only question is whether the Policy violates the rules for such a forum.

A limited public forum exists where the government opens its property "for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). In a limited public forum, the government can restrict the topics up for discussion. *Summum*, 130 F.3d at 916. But any speech restrictions must be "reasonable in light of the purpose served by the forum" and viewpoint neutral. *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985)). That means the government "must be able to articulate some sensible basis" for its rule, *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018), and the rule must "preserve[] the purpose of the forum," *Summum*, 130 F.3d at 917. Regardless of its rationale, the government cannot "target[] particular views taken by speakers on a subject." *Id.* (cleaned up).

I.   THE PERSONNEL RULE VIOLATES THE FIRST AMENDMENT AS APPLIED TO
     SPEAKERS MENTIONING STAFF WHILE DISCUSSING SCHOOL POLICY (COUNT I).

The Personnel Rule is neither reasonable nor viewpoint neutral when applied to individuals who mention public officials while discussing school policy outside the context of private or confidential employment matters. This as-applied claim differs from the facial challenge Pollak originally brought because it is directed to a particular "universe" of circumstances in which the Policy applies. *See United States*

*v. Supreme Court of N.M.*, 839 F.3d 888, 914 (10th Cir. 2016); (ECF No. 43 at 19).

That means that, unlike in a facial challenge, Pollak need not show that the Policy

is unconstitutional in "all conceivable applications contemplated by the challenged

provision." *Id.* Rather, Pollak can prevail by demonstrating that the Policy is

unreasonable and discriminates based on viewpoint only when applied to speakers

who mention public officials while discussing school policy outside the context of

private or confidential employment matters.

   A. *The Personnel Rule is unreasonable because it bans speakers from*
      *commenting on matters discussed at SCSD2's public meetings.*

   The Personnel Rule violates the First Amendment because "no conceivable

governmental interest" justifies prohibiting individuals from discussing the very

matters that SCSD2 administrators speak about during the Board's public

meetings. *See Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987).

Yet that is what the rule does: Individuals listening to the superintendent's report

about district policy are *forbidden* from commenting about it. This defies reason.

   Speech restrictions at a limited public forum must reasonably "preserve[] the

purpose of the forum." *Summum*, 130 F.3d 917. Although deferential, this standard

"does not mean the government has unbridled control over speech." *Id.* at 916.

Rather, the government bears the burden of "articulat[ing] some sensible basis for

distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at

1888. It "must draw a reasonable line." *Id.* And that line must further—rather than

undermine—the purpose of the forum. *Id.* at 1891.

1. Start with the purpose of the forum. SCSD2 holds a public-comment period to "hear viewpoints of citizens throughout the district." BEDH Policy at 1. In doing so, it invites citizens to present comments about "school operations and programs," *id.*, directing speakers to limit comments "to items which relate directly to the school district," *id.* at 2. Thus, the purpose of the forum is to allow comments about SCSD2's school operations and programs.

The Personnel Rule undermines that purpose. Schools are run by people. Those people implement school programs, manage school operations, and execute school district policy. It thus makes no sense to conflate discussions about school policy that mention personnel with discussions about actual personnel matters (like employee evaluations). In fact, Defendant Wilson agrees:

Q: So a report on a program that discusses personnel is not a personnel matter?

A: I'm not sure. I mean, when you're talking about programs, you talk about the people that are running them. I'm not talking about an evaluation or anything else. He's running this program. That's what he's doing.

Wilson Depo. at 73:9–15. The Personnel Rule thus "undermine[s]" SCSD's "interest in maintaining" a forum to hear comments about school operations and programs, *Mansky*, 138 S. Ct. at 1891, because it prevents speakers from talking about "the people that are running them." *Id.*; *see also Marshall v. Amuso*, 571 F. Supp. 3d 412, 426 (E.D. Pa. 2021).

SCSD2's inconsistency in prohibiting discussing staff in public makes the rule even more unreasonable. SCSD2 hears from various district administrators at every meeting, including the superintendent. The Board schedules audience comments at

-11-

the end of its meetings specifically so that speakers can listen to those administrators and "hear all about the workings of the school district" before giving their remarks. SCSD2 Depo. at 28:16–19, 29:11–17, 30:1–6; Ex. 7 at 3–4. Superintendent Stults, who recommended that the board structure its meeting this way, explained that it's "important" for "the individuals who are showing up at a Board meeting [to] speak during the audience comments" so that they can "hear the superintendent's report among other things." SCSD2 Depo. at 29:11–17. But the Personnel Rule prohibits speakers from discussing what they heard, undermining the Board's stated purpose of hearing viewpoints from citizens about school operations. And that bizarre result is exactly what happened here: The Board prevented Pollak from responding to the superintendent's discussion of school policy at a public meeting. This rule in no way "preserves the purpose of the forum." *See Summum*, 130 F.3d at 917.

Making matters worse, the Personnel Rule prohibits core First Amendment speech. "The right to criticize public officials is at the heart of the First Amendment's right of free speech[.]" *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir. 1993). The Constitution protects "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). And that includes criticizing school administrators. *See McElhaney v. Williams*, --- F.4th ---, 2023 U.S. App. LEXIS 22466, at *11–12 (6th Cir. Aug. 25, 2023). So it "is a serious matter when the whole point of the [Personnel

Rule] is to prohibit the expression of political views" about the officials responsible for enacting and executing government policy. *See Mansky*, 138 S. Ct. at 1891.

2. Nor can SCSD2 save its rule by "articulat[ing] some sensible basis" for banning all mention of any school personnel no matter the context. *Id.* at 1888. The Board has offered a handful of justifications—all of which center on protecting confidential and private information about employees and making sure that employment matters go through the proper administrative procedures. *See* Def. MSJ, ECF No. 64 at 12. None of those justifications apply when a speaker simply responds to an SCSD2 administrator's public comments at a Board meeting about school policy, as Pollak did here.

SCSD2 knows this. Its own view of "personnel matters" ebbs and flows with no rhyme or reason. Consistent with the BEDH Policy, the Board goes into executive session at nearly every meeting to discuss "personnel matters." *See, e.g.*, Ex. 11 at 11 ("The Board went into Executive Session at 7:27 p.m. to address personnel and legal matters."). But the Board and SCSD2 administrators often discuss SCSD2 employees outside of such executive session. *See, supra*, at 3 (¶3). In fact, every SCSD2 meeting includes a period for "recognitions," during which it "acknowledge[s]" and "recognize[s] specific individuals for accomplishments that they have achieved." SCSD2 Depo. at 33:15–19. And the administrators' monthly reports often involve discussing specific staff members and their job performance. *See, e.g.*, Ex. 4 at 6 ("Mr. Mayhue has had a steep learning curve and has done an incredible job in getting the Virtual program up and running."). Given all these

times that SCSD2 allows mentioning staff at its public meetings, it is unreasonable to disallow audience members to do the same while discussing school policy.

### B. The Personnel Rule unreasonably invites arbitrary enforcement.

The Personnel Rule fails the reasonableness test in another way: it gives the chair absolute discretion without "objective, workable standards" to guide enforcement. *See Mansky*, 138 S. Ct. at 1891.

The Personnel Rule prohibits discussing "[p]ersonnel matters" during "regular board meetings." BEDH Policy at 2. The policy does not define "personnel matters," but that phrase "can be expansive." *Manksy*, 138 S. Ct. at 1888.

Defendant Wilson, the former chair, believes the rule prohibits mentioning the name of any employee for any reason. Wilson Depo. at 34:21–35:8–11; *see also id.* at 32:15–18. But she also testified that saying "thank you" to the superintendent is not "against the policy per se." *Id.* at 67:17–23. And she testified that, under her understanding of the rule, a comment might not violate the Personnel Rule if it was "thanking the board and . . . mentioned the superintendent," so long as the comment "was crediting the board for what [it] did." *Id.* at 66:22–67:4.

The current chair, Defendant Rader, has a different perspective. When asked about his understanding of the term, he said he would "defer to our district attorney," but that his understanding is a personnel matter is something "pertaining to the employment of a district staff member." Rader Depo. at 29:11–15. Unlike Wilson, Rader does not believe that merely mentioning the superintendent violates the rule. *See id.* at 49:1–50:18. He has presided over two meetings where speakers made favorable comments about the superintendent, mentioning him by

-14-

name. *Id.* at 45:11–47:21; 49:1–50:18. Rader testified that he believes neither speaker violated the rule. *Id.* at 46:7–9; 50:2–4. As for whether Pollak violated the rule on February 7, Rader demurred, *id.* at 37:24–38:1–4, but added that believes "context" differentiates Pollak's comments from the other two speakers who spoke positively of the superintendent, *id.* at 47:18–21, 50:8–18.

The indeterminacy poses a problem because the Board gives the chair virtually unlimited discretion to decide what the Policy means. The Board's representative repeatedly testified that whether mentioning the name of an employee violates the rule "is a decision made by the Board Chair." SCSD2 Depo. at 53:9–13; *id.* at 55:4–10 ("Q: [T]he Board's understanding of this policy is that the Board Chair has the prerogative to decide whether or not comments violate the policy; is that right? A: That is correct."); *id.* at 58:23–24 ("That's the Board [Chair's] decision to determine whether it violates participation guidelines."). So the Policy means one thing when Wilson chaired the board, and perhaps another now that Rader does. And who knows what it will mean when the Board elects its next chair.

"It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse, especially where it has received a virtually open-ended interpretation." *Mansky*, 138 S. Ct. at 1891 (cleaned up). While "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *id.*, SCSD's "difficulties with its restriction go beyond close calls on borderline or fanciful cases," *id.* "And that is a serious matter when the whole point of the exercise is to prohibit the expression of political views." *Id.*

The Board vests total discretion in the chair to decide whether comments violate the rule. "[T]hat discretion must be guided by objective, workable standards." *Id.* But when asked "how does the Board Chair know what violates the public participation guidelines," SCSD2's representative said, "That's a question I can't answer. That's a question that you would have to ask the Board Chair." SCSD2 Depo. at 50:14–19. If SCSD2 "wishes" to limit the context in which speakers can discuss personnel during public comment, "it must employ a more discernable approach than the one [it] has offered here." *Mansky*, 138 S. Ct. a 1891.

C. *The Personnel Rule discriminates based on viewpoint.*

The Personnel Rule suffers from yet one more constitutional flaw: it discriminates based on viewpoint. That's not because the rule prohibits negative comments but allows positive ones. Rather, the Personnel Rule, as applied to those who mention school officials when discussing school policy, targets the perspective of those who believe school officials deserve credit or blame for school operations.

"The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal v. Tam*, 582 U.S. 218, 249 (2017) (op. of Kennedy, J.). "It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Id.* This principle reflects an "understanding of the complex and multifaceted nature of public discourse." *Rosenberger*, 515 U.S. at 831. It recognizes that not "all debate is bipolar." *Id.* One person may oppose a government policy for one reason, while another individual may oppose that same policy for a different reason. Both individuals are on the same side of the debate, but they have different viewpoints.

-16-

The Supreme Court's decision in *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), shows how this principle works. In *Lamb's Chapel*, a church brought suit against a school district for rejecting its request to use school facilities to show a religious film series about family issues. *Id.* at 388–89, 393. The district allowed the public to use its property "for social or civic purposes" but not for "religious purposes." *Id.* at 393. It argued that the restriction against religious use was a permissible subject-matter limitation for a limited public forum because "all religions and all uses for religious purposes are treated alike." *Id.* But the Supreme Court rejected this narrow version of viewpoint discrimination. The district opened its facilities for "social and civic purposes," and "[t]he film series involved here no doubt dealt with a subject otherwise permissible." *Id.* at 394. The church's application "was denied solely because the series dealt with the subject from a religious standpoint." *Id.* This same problem exists here: The Personnel Rule excludes an entire class of viewpoints on otherwise permissible discussion topics by prohibiting speakers from talking about employees while discussing policy and programs.

A practical example of how the rule applies illustrates the problem. Under the Policy, a speaker may voice the opinion that a school is underperforming because the curriculum is wrong, because teachers are underpaid, or because the class sizes are too large. But a speaker is forbidden from voicing the opinion that a school is underperforming because the school officials—the superintendent, the principal, or the teachers—responsible for executing school policy are failing. A comment

criticizing school curriculum is fine. A comment criticizing personnel for choosing that curriculum is not. That is quintessential viewpoint discrimination. It "targets 'particular views taken by speakers on a subject.'" *Summum*, 130 F.3d at 917 (quoting *Rosenberger*, 515 U.S. at 829–30). In this way, the Personnel Rule is not a subject-matter limitation at all, as even Wilson herself recognizes. *See* Wilson Depo. at 73:11–12 (explaining that "when you're talking about programs, you talk about the people that are running them").

Nor does it matter that the Personnel Rule prohibits positive and negative comments alike. That conclusion "reflects an insupportable assumption that all debate is bipolar," contravening the Supreme Court's "understanding of the complex and multifaceted nature of public discourse." *Rosenberger*, 515 U.S. at 831. Debate on public issues does not always boil down to whether one is for or against a particular proposal. And because of that, "[t]he First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal*, 582 U.S. at 249 (op. of Kennedy, J.). This "broad construction" of viewpoint discrimination dooms the Personnel Rule. *Summum*, 130 F.3d at 917.

*D. The Board unconstitutionally applied the Personnel Rule against Pollak.*

Pollak also challenges the Board's discriminatory enforcement against him. To prevail, he "'must show that [he was] prevented from speaking while someone espousing another viewpoint was permitted to do so.'" *Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023) (quoting *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014)). Even if the Court finds that the Personnel Rule is constitutional as applied to speakers who mention public officials while discussing school policy, the

uncontroverted evidence establishes that Wilson enforced the policy against Pollak when he criticized the superintendent while allowing—and even encouraging— other speakers to express positive views.

Wilson testified that she understands the Personnel Rule to prohibit speakers from mentioning specific SCSD2 employees for any reason. Wilson Depo. at 32:15– 18, 34:21–35:8–11. Despite that, she "often" told speakers that "[c]ompliments and congratulations to employees are always welcome." *Id.* at 36:25–37:12. Wilson explained that she did this even though it violated the rule because she wanted people to "feel welcome." *Id.* at 37:6–9, 37:16–20. Consistent with this view, Wilson "never felt it necessary to stop anyone [other than Pollak]" from speaking, *id.* at 76:16–19, even though multiple speakers made positive comments about SCSD2 employees when she was chair, *see* Ex. 3 at 4; Wilson Depo. at 38:18–39:15; Ex. 9 at 17; Wilson Depo. at 62:9–18, 64:7–11. On the other hand, Wilson "never allowed anyone to speak critical about" an employee. Wilson Depo. at 76:9–17.

The censorship here fits that discriminatory pattern. Here's how Wilson explained her decision to interrupt Pollak: "Because he became – he started right out saying that his [constitutional] amendment rights were discredited. He [was] going to rebuttal Mr. Stults, *and he was very critical in his speech*." *Id.* at 44:9–12 (emphasis added). Then, only four weeks after censoring Pollak for being "very critical in his speech," *id.*, Wilson again told speakers that "comments regarding personnel were not allowed *unless positive feedback was given*," *id.* at 41:4–12; *see also* Ex. 8 at 10 (emphasis added). And she followed through with that

encouragement several months later, allowing a speaker to praise SCSD2 staff without interruption. *See* Ex. 9 at 17. Only one reasonable conclusion follows: Wilson enforced the Personnel Rule against Pollak when she perceived him as being critical but allowed others to speak favorably.

SCSD2's argument otherwise relies on sleight of hand. It characterizes the issue as whether Wilson discriminated against him because of "his opposition to the mask requirement and/or other actions taken by the Board during the pandemic," and then cites evidence of the Board allowing such criticism. Def. MSJ, ECF No. 64 at 13. But focusing on whether Pollak could criticize the masking policy ignores his claim. Pollak alleges that Wilson censored him to stop him from "criticiz[ing] the superintendent's public statements" about the policy. Amend. Compl., ECF No. 43 at 13 (¶52). And no evidence shows that Pollak or anyone else could do so. Yet ample evidence shows that Wilson (and Rader after her) allowed speakers to praise SCSD2 employees, the superintendent included.

No reasonable juror could dispute that Wilson "prevented [Pollak] from speaking while someone espousing another viewpoint was permitted to do so." *Harmon*, 61 F.4th at 789. Pollak is thus entitled to judgment as a matter of law.

## II. THE OFFENSIVE SPEECH RULE VIOLATES THE FIRST AMENDMENT (COUNT THREE).

The rule barring abusive and vulgar language discriminates based on viewpoint.

*Abusive speech.* The First Amendment's prohibition on viewpoint discrimination prevents the government from banning speech because it disparages or offends. *See Matal*, 137 S. Ct. at 1763, 1766; *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299–2300

(2019). The Policy does not define "abusive," but the ordinary meaning is "harsh insulting language." *Gooding v. Wilson*, 405 U.S. 518, 525 (1972) (citing Webster's Third New International Dictionary (1961)); *accord Abusive,* Merriam-Webster ("using harsh, insulting language"), available at https://perma.cc/R7DYC9SR. That definition matches the Board's understanding, as well as the current chair's. SCSD2 Depo. at 110:7–22; Rader Depo. at 56:13–21 (explaining that abusive language is "hurtful words"). Banning language because it is harsh, insulting, negative, or hurtful is viewpoint discrimination. *See Brunetti*, 139 S. Ct. at 2900–2300; *see also Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893–94 (6th Cir. 2021).

*Vulgar speech*. The policy does not define "vulgar." Rader testified that he understands vulgar to include "[c]urse words, something inappropriate for the public audience," Rader Depo. at 60:7–11, and the Board's understanding is similar. SCSD2 Depo. at 110:24–7. The ordinary meaning of "vulgar" includes "lacking in cultivation, perception, or taste," "morally crude," "and offensive in language." *See Vulgar*, Merriam-Webster, available at https://perma.cc/Y5YP-FJZU. Prohibiting vulgar speech thus discriminates based on viewpoint because it restricts speech in reference to "conventional moral standards." *Brunetti*, 139 S. Ct. at 2300.

III.   THE OFFENSIVE SPEECH RULE IS VAGUE AND OVERBROAD (COUNTS FIVE & SIX).

*Vagueness*. A law or regulation is void-for-vagueness when "people of ordinary intelligence" do not have "a reasonable opportunity to understand what conduct it prohibits." *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1201 (10th Cir. 2005) (quotation omitted). "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly

marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (cleaned up). That kind of chilling effect cannot stand when it "abuts upon sensitive areas of basic First Amendment freedoms." *Id.* at 109 (cleaned up).

All four categories of banned speech in the Offensive Speech Rule are unconstitutionally vague because they lack "objective, workable standards" that a person of ordinary intelligence can understand. *Marshall*, 571 F. Supp. 3d at 424 (quoting *Mansky*, 138 S. Ct. at 1891). The terms are "irreparably clothed in subjectivity." *Id.* This subjectivity renders the rule unconstitutionally vague. *Id.*

The term "abusive" lacks any objective criteria that a person of ordinary intelligence can understand because what is considered "harsh" or "insulting" is subjective. *Id.* The same is true for the terms "vulgar," "gossip," and "defamatory remarks." Rader testified that "vulgar" language is any language the chair deems "inappropriate." Rader Depo. at 59:12–21. "Gossip," Rader explained, depends on whether the chair personally "knew [the comments] to be [true] one way or the other." *Id.* at 53:4–11. And whether something amounts to a "defamatory remark" changes based on the chair's subjective, guidance-free "judgment" about whether the speaker was being nice or not. *Id.* at 54:18–21, 54:25–55:5, 55:25–56:7.[5] All these terms lack the kind of objective criteria the First Amendment requires.

---

[5] Although defamation is not protected speech, the tort includes elements that no person could adjudicate on the spot during a board meeting—compounding the vagueness problem. Rader himself admits that he does not even know, for example, whether a true statement can be defamatory. *Id.* at 54:22–24. Given that its own chair cannot explain what defamation is under the policy, no person of reasonable intelligence could be expected to do so either.

*Overbreadth.* "Vagueness and overbreadth [are] logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). A law is overbroad when it "punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Faustin*, 423 F.3d at 1199.

Here, that burden is easily satisfied. The Supreme Court has already held that a restriction that prohibits speakers from using "words offensive to some who hear them . . . sweeps too broadly." *Gooding*, 405 U.S. at 527. That is precisely what the prohibition on abusive and vulgar speech do. *See supra* at 20–21. The ban on gossip likewise sweeps too broadly, as it includes even truthful speech with no obvious example of what kind of unprotected speech it even covers. Rader Depo. at 52:25–53:1 (explaining the common definition of gossip is "talk that may – may or may not be true about someone"). The same is true for the ban on defamatory remarks. While actual defamation is not protected by the First Amendment, *see supra* at 22 n.5, the chair has discretion to enforce this rule based on his own judgment—not the law—which means it could include true and complimentary statements if the chair determines in his "judgment" that the comment was derogatory, *id.* at 54:22–56:7.

IV.    BOTH RULES VIOLATE THE PETITION CLAUSE (COUNTS TWO AND FOUR).

The First Amendment right to petition the government for redress "extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Generally speaking, claims under the Petition Clause are "analyzed no different than" a claim under the Free Speech Clause. *Glover v. Mabrey*, 384 F. App'x 763, 776 (10th Cir. 2010) (citing *Schalk v. Gallemore*, 906 F.2d 491, 498 (10th Cir. 1990)). Appearing before an elected school board to engage in a

public discussion about school policy constitutes "petition[ing] the Government for a redress of grievances." U.S. Const. amend. I. The Personnel and Offensive Speech Rules violate Pollak's right to petition for the same reason that they violate his right to free speech.

V.    POLLAK IS ENTITLED TO NOMINAL DAMAGES AND A PERMANENT INJUNCTION.

*Nominal damages.* Pollak is entitled to nominal damages in the amount of $17.91 to compensate him for his constitutional injury. Nominal damages redress injuries when a plaintiff "cannot or chooses not to quantify that harm in economic terms." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). When damages are not quantified, "nominal damages are mandatory upon a finding of a constitutional violation." *Stoedter v. Gates*, 704 F. App'x 748, 758 (10th Cir. 2017) (citing *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001)). The Court should thus enter judgment for Pollak for $17.91.

*Permanent Injunction.* To obtain a permanent injunction, Pollak "must prove (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *United States v. Uintah Valley Shoshone Tribe*, 946 F.3d 1216, 1222 (10th Cir. 2020). On the first factor, Pollak succeeds on the merits for the reasons discussed above. He suffers irreparable harm absent an injunction because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020). Finally, the last two factors merge when the opposing party is

the government, *Denver Homeless out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022), and injunctions "protecting the core First Amendment right of political expression" serves the public interest, *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001). Thus, all four factors favor Pollak. The Court should enter a permanent injunction barring the Board from enforcing its policies (1) prohibiting discussing personnel matters, as applied to individuals who want to mention, refer to, or criticize public officials while discussing school policies and procedure; and (2) prohibiting speakers from "participat[ing] in gossip, mak[ing] defamatory remarks, [or] us[ing] abusive or vulgar language."

## CONCLUSION

The Court should grant the motion for summary judgment for Pollak, declare the Personnel Rule and Offensive Speech Rule unconstitutional, enter a permanent injunction, and award Pollak $17.91 in nominal damages for his past injury.

Dated: October 6, 2023.                            Respectfully submitted by,

/s/ Brett R. Nolan                              /s/ Seth Johnson (w/ permission)
Brett R. Nolan (*pro hac vice*)              Seth "Turtle" Johnson (WBA 7-5748)
INSTITUTE FOR FREE SPEECH           Adelaide P. Myers (WSB 7-6500)
1150 Connecticut Avenue, N.W., Suite 801    SLOW AND STEADY LAW OFFICE, PLLC
Washington, D.C. 20036               1116 W. Farm Ave.
(201) 301-3300                      P.O. Box 1309
bnolan@ifs.org                    Saratoga, WY 82331
                                    (307) 399-6060
*Counsel for Plaintiff*                Turtle@SlowandSteadyLaw.com
                                    Addie@SlowandSteadyLaw.com

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record on October 6, 2023, using the Court's CM/ECF system. I further certify that the video exhibits submitted with this filing were served via mail upon the following:

Kendal R. Hoopes
Yonkee & Toner, LLP
P.O. Box 6288
Sheridan, WY 82801

<u>/s/ Brett R. Nolan</u>
*Counsel for Plaintiff*